## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

WACKO'S TOO, INC., etc., et al.,

     Plaintiffs,

v.                                                           Case No. 3:20-cv-303-TJC-MCR

CITY OF JACKSONVILLE, etc.,
et al.,

     Defendants.

_____

### O R D E R

     This case is about whether the City of Jacksonville may impose certain restrictions on adult entertainment businesses and their performers without running afoul of the Constitution. A group of thirteen adult entertainment establishments and four performers filed this lawsuit[1] against the City of Jacksonville and Sheriff Mike Williams in his official capacity as Sheriff of

_____

[1] Two related cases are also assigned to the Court: Emperor's, Inc. v. City of Jacksonville, Case No. 3:19-cv-1110-TJC-MCR and Stadium Club, Inc. v. City of Jacksonville, Case No. 3:20-cv-20-TJC-JRK. The outcome of Emperor's and of Stadium Club depends, at least in part, on the ruling in this case. (See Doc. 9). As discussed at a hearing in this case on July 14, 2020, both Emperor's, Inc. and Stadium Club have been administratively closed during the pendency of this case, to be re-opened upon motion of the parties.

Duval County.[2] (Doc. 1). The Complaint alleges violations of the First, Fourth, and Fourteenth Amendments stemming mostly from Ordinance 2020-74-E, enacted by the Jacksonville City Council in February 2020 to amend Chapters 150 and 151 of the Jacksonville Code. Immediately after filing the Complaint, Plaintiffs filed a Motion for Preliminary Injunction as to certain counts. (Doc. 2). The Court elected to consolidate the preliminary injunction hearing with a non-jury trial on the merits. See Fed. R. Civ. P. 65(a)(2). The City agreed to abate enforcement of the Ordinance until the Court rules on the issues. (Doc. 21 at 3).

The parties agreed to a list of eleven selected counts to be tried on an expedited basis, all of which the parties view as purely legal issues involving facial constitutional challenges or preemption. (Doc. 21).[3] Plaintiffs then

---

[2] N.O. Archbold, a Vice Detective with the Jacksonville Sheriff's Office, is also sued in her individual capacity. Plaintiffs allege that "she acted in that capacity at all times material to this action." (Doc. 1 at ¶ 28). She is implicated only in limited Counts of the Complaint that are not discussed in this Order but are preserved for trial at a later date.

[3] The Counts that the parties chose for the expedited trial are: Count I – Licensing provisions in Ordinance 2020-74-E impose an unconstitutional prior restraint; Count II – Ordinance 2020-74-E violates the First Amendment because it is not narrowly tailored; Count III – The new license suspension and revocation procedures violate due process, are ultra vires, and are otherwise unlawful; Count IV – The prohibition against performers under the age of twenty-one is unconstitutional; Count V – Ordinance 2020-74-E imposes an unconstitutional licensing fee; Count VI – Ordinance 2020-74-E violates the First Amendment because it is constitutionally underinclusive; Count VII – Fourth Amendment violation of warrantless administrative searches and seizures under §§ 150.224(g) and § 151.214(g); Count VIII – "Simulate sexual

submitted a Trial Brief on Agreed Legal Issues (Doc. 23). The City filed a response in opposition (Doc. 25), Plaintiffs filed a reply (Doc. 28), and the City filed a sur-reply (Doc. 29). The City also filed over six hundred pages of documents in support of its response. (Docs. 30, 30-1, 30-2, 30-3, 30-4, 30-5, 30-6, 30-7, 30-8). On the eve of the bench trial, the City filed two additional affidavits. (Docs. 33, 33-1, 34, 34-1). Plaintiffs recently filed a Notice of Supplemental Authority in Support of Count I of their Complaint (Prior Restraint). (Docs. 38, 38-1). The Court conducted a non-jury trial on the selected counts on September 18, 2020, the record of which is incorporated by reference. (Doc. 36). The remaining issues are preserved for trial at a later date. (Doc. 21 at 2).

## I.   BACKGROUND

The City passed Ordinance 2020-74-E on February 25, 2020, effective March 5, 2020. (Doc. 1 ¶ 44). The Ordinance amended Chapters 150 and 151 of the Jacksonville Code by instituting new licensing requirements for performers at adult entertainment establishments in Jacksonville, in addition to other

---

activity" is vague, overbroad, and not narrowly tailored; Count XI – Sections 150.214(b) and 151.214(b) are unenforceable because the undefined terms "owner," "operator," and "manager" are unconstitutionally vague; Count XIII – Sections 150.224 and 151.214 are preempted by federal law, 8 U.S.C. §§ 1324(a)–1324(b); and Count XIV – The prohibition against performers under the age of twenty-one is preempted by state law, § 562.13, FLA. STAT. (Docs. 1 at 17–84, 21 at 2).

changes. (See Doc. 1-1). Plaintiffs fall into three categories: (1) "Dancing entertainment establishments," called "bikini bars," regulated primarily by Chapter 151 that "provide live exotic dance performances in a nightclub format where alcoholic beverages are sold," and where performers wear coverings over their breasts, buttocks, and pubic regions; (2) Sinsations, an "adult entertainment establishment" regulated primarily under Chapter 150, that operates a "juice bar" with no alcoholic beverages and has nude dancing in a nightclub setting; and (3) individual performers and independent contractors Natalie Sanchez, Neva Clinkscale, Chelsea Gallagher, and Rebecca Anderson, who have worked at one or more of the establishments. [4] Sanchez and Clinkscale are over eighteen but under twenty-one. (Doc. 23 at 5). Sanchez has worked at Sinsations. Id. at 5. The other performers have worked exclusively at bikini bars. Id. Under the Ordinance, all four are required to obtain a Work Identification Card to continue dancing at the establishments, but the Ordinance also prohibits anyone under age twenty-one from obtaining a card.

---

[4] The Court uses "adult entertainment establishments" or "Club Plaintiffs" to refer to dancing entertainment establishments (bikini bars) and adult entertainment establishments (Sinsations) together. When the Court distinguishes between the two, the Court refers to them as "bikini bars" or "Sinsations."

The City contends that the licensing requirements and restrictions are designed to combat human trafficking. At trial, the City highlighted these excerpts from a six-hundred-page record:

- "The warning signs of human sex trafficking include the presence of strip clubs and 'streetwalkers.' The FBI has also reported that certain locations such as truck stops, massage parlors, and strip clubs are often havens for sex trafficking. An FBI task force in Portland, Oregon, a hot spot for human sex trafficking, found a huge overlap between strip clubs and the sex trade. One member of the task force stated, 'It's no secret that pimps and traffickers will go to strip clubs to try to find girls to traffic and promote or compel into prostitution.' In another investigation of four strip clubs that was led by agents of the FBI, IRS, and local police, graphic court filings detailed how in the dimly lit 'VIP' rooms, dancers and patrons engaged in open sex acts for money." (Doc. 30-7 at 45) (excerpted from Dan O'Bryant, Inextricably Bound: Strip Clubs, Prostitution, and Sex Trafficking, 2 DIGNITY: J. SEXUAL EXPLOITATION & VIOLENCE 3, 3 (2017)).

- "Victims of sex trafficking are frequently recruited to work in strip clubs across the United States. Women, men, and minors may be recruited to work in strip clubs as hostesses, servers or dancers, but then are required to provide commercial sex to customers. Individuals forced to serve as hostess, servers, or dancers but not required to provide commercial sex may still be victims of labor trafficking. Strip clubs are designed to provide the space and environment in which buyers may purchase commercial sex. Victims of sex trafficking in strip clubs must adhere to extensive, pre-determined schedules and are frequently moved between multiple clubs. Commercial sex sometimes takes place in the bathroom, VIP, or lap dance rooms, or offsite in hotels or buyer's [sic] homes." (Doc. 30-7 at 52) (excerpted from NATIONAL HUMAN TRAFFICKING HOTLINE, Hostess/Strip Club-Based).

- "Victims of sex trafficking may be women, men, or minors, though it is more common for females to be induced into

commercial sex in this venue. They may be U.S. citizens, or foreign nationals with valid visas, expired/fraudulent visas or without documentation." (Doc. 30-7 at 53) (excerpted from NATIONAL HUMAN TRAFFICKING HOTLINE, Hostess/Strip Club-Based).

- "A Scores strip club in Florida hired a 'severely' disabled 17-year-old sex trafficking victim with a fake ID and allowed her to be groped and molested by adult men, a scathing lawsuit filed Wednesday alleges." (Doc. 30-8 at 55) (Gabrielle Fonrouge, Scores strip club sued for allowing sex trafficking of disabled teen, N.Y. POST, Jan. 29, 2020)."[5]

- "123 of the 292 survivors whose accounts were analyzed disclosed their age when they first engaged in commercial sex to the NHTRC or BeFree Textline. 44% of those survivors estimated that they were 17 or younger, and the average age of first participation was 19 years old." (Doc. 30-3 at 77) (emphasis in original) (excerpted from POLARIS, Sex Trafficking in the U.S.: A Closer Look at U.S. Citizen Victims). The report also includes a graphic that shows an estimated thirty-eight percent of survivors are fourteen to seventeen years old at the time of their first commercial sex act, while an estimated thirty-percent are eighteen to twenty-one." Id. at 78.

In addition, the Ordinance itself contains several "whereas" clauses:

WHEREAS, Florida is ranked third nationally for reported cases of human trafficking abuses, many of which involved sex trafficking; and

WHEREAS, strip clubs and hotels/motels are widely recognized as being a significant part of the sex trafficking network used by traffickers to coerce and facilitate men, women and children into performing sexual acts, which places the employees of these establishments in direct and frequent contact with the victims of human trafficking; and

WHEREAS, in 2019, the American Hotel & Lodging Association ("AHLA") launched its, "No Room for Trafficking" campaign, which

---

[5] At trial, the City mistakenly asserted that Scores is one of the Club Plaintiffs in this case. It is not. (Doc. 36 at 90:9–10).

established the goal of training every hotel employee to spot and stop trafficking; and

WHEREAS, on January 9, 2020, the AHLA, the Florida Restaurant & Lodging Association, the Asian American Hotel Owners Association, the National Football League, Florida Attorney General Ashley Moody and various state and federal officials met to develop a prevention and response campaign concerning use of Florida's hotel industry for sex trafficking during and around Super Bowl LIV in Miami; and

WHEREAS, hotels and motels are a crucial piece of the infrastructure necessary to facilitate human trafficking (particularly sex trafficking) in escort services – of the 3,596 cases of human trafficking reported to the National Hotline to be occurring at a hotel, 2,920 or 81 percent of those involved sex trafficking; and

WHEREAS, victims of sex trafficking are frequently recruited to work as performers or employees in strip clubs; and

WHEREAS, researchers have found that sex trafficking victims are more likely to be trafficked by someone from within her or his own community; and

WHEREAS, persons under the age of twenty-one are more likely to still remain within and dependent on the community in which they were raised; and

WHEREAS, research studies have identified the average age at which a person in the United States enters the sex trade for the first time is age seventeen (17); and

WHEREAS, because of the prevalence of human and sex trafficking among Florida's youth population, on September 30, 2019, Florida's State Board of Education voted unanimously to make Florida the first state in the country to require child trafficking prevention education for all public education students in grades K–12; and

WHEREAS, on January 14, 2020, the U.S. Department of Justice hosted the Summit on Combating Human Trafficking to focus attention on and highlight the federal government's efforts to address all aspects of human trafficking; and

WHEREAS, on February 3, 2020, the Council conducted a Sex Trafficking workshop at which representatives from the Jacksonville Sheriff's Office, the Federal Bureau of Investigation and the Department of Homeland Security provided information and statistics on human and sex trafficking, as well as endorsing the means established in this legislation as appropriate and

meaningful to reduce or prevent these activities from occurring in Jacksonville; and

WHEREAS, sex trade at strip clubs is a common occurrence in Jacksonville, thereby subjecting performers at these strip clubs to frequent propositions and enticements to engage in sex trade actions and sex trafficking from customers, as well as strip club employees, managers and owners; and

WHEREAS, on November 16, 2018, the federal Fifth Circuit Court of Appeals, in the case of <u>Jane Doe I v. Landry</u>, reported at 909 F.3d 99 (5th Cir. 2018), upheld a regulation enacted by the State of Louisiana to prohibit persons under the age of twenty-one from nude erotic dancing at establishments serving alcohol on the grounds that such a regulation furthered the state's interests in curbing human trafficking and prostitution[.]

(Doc. 1-1 at 3–5). Councilwoman LeAnna M. Cumber also submitted a declaration regarding how she went about introducing the Ordinance and getting it passed. (Doc. 30-1). At Councilwoman Cumber's request, the City Council held a workshop about human trafficking shortly before passing the Ordinance. <u>Id.</u> ¶ 6.

Plaintiffs challenge provisions of the Ordinance related to the performer licensing scheme, including the age restriction, as well as several portions of Chapters 150 and 151 related to club licenses, procedures, fees, and the language of the Code.

## II.    ISSUES REGARDING PERFORMER LICENSES

Performing at adult entertainment establishments is protected expressive activity under the First Amendment. The Supreme Court has recognized that erotic dancing falls in the First Amendment's "outer ambit."

See, e.g., City of Erie v. Pap's A.M., 529 U.S. 277, 289 (2000) ("As we explained in Barnes, . . . nude dancing . . . is expressive conduct, although we think it falls only within the outer ambit of the First Amendment's protection."); Barnes v. Glen Theater, Inc., 501 U.S. 560, 565–66 (1991) (confirming that the Supreme Court has made statements that "support the conclusion" that "nude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so."); Fly Fish, Inc. v. City of Cocoa Beach, 337 F.3d 1301, 1314 (11th Cir. 2003) ("Although nude dancing may be at the 'outer perimeter' of the First Amendment's protection, the Supreme Court has never suggested that it is not protected by the First Amendment. On the contrary, Erie recently specifically reaffirmed that it is so protected.") (citing Erie, 529 U.S. at 289); Redner v. Dean, 29 F.3d 1495, 1499 (11th Cir. 1994) ("We find it well settled that nude dancing is expressive conduct entitled to some degree of First Amendment protection.").[6]

---

[6] While cases tend to focus on nude dancing, there is no dispute that erotic dancing, i.e., when performers are not entirely nude, also carries First Amendment protection. First Amendment protection is tied not to the degree of nudity, but to whether performers convey an erotic message. See Barnes, 501 U.S. at 571 ("[T]he requirement that the dancers don pasties and G-strings does not deprive the dance of whatever erotic message it conveys; it simply makes the message slightly less graphic.").

Still, a city may place regulations on adult entertainment. <u>See generally</u> <u>Redner</u>, 29 F.3d at 1499 ("While it enjoys some degree of First Amendment protection . . . nude dancing is not immune from governmental regulation."). The Supreme Court and appeals courts, including the Eleventh Circuit, have recognized that due to negative secondary effects, local governments can regulate adult entertainment within certain constitutional confines. Examples of such regulations include restricting adult entertainment establishments to specified commercial zones, banning alcohol sales, limiting hours of operation, and more. <u>See, e.g.,</u> <u>Doe I v. Landry</u>, 909 F.3d 99, 110 (5th Cir. 2018) (upholding an age restriction to participate in nude dancing at liquor-licensed adult entertainment establishments because of "a link between the [restriction] and curbing the identified secondary effects of human trafficking and prostitution"); <u>American Entertainers, LLC v. City of Rocky Mount</u>, 888 F.3d 707, 716, 723 (4th Cir. 2018) (upholding a city ordinance requiring sexually-oriented businesses to obtain licenses, pay licensing fees, and restrict the age of owners); <u>Fly Fish, Inc.</u>, 337 F.3d at 1315 (upholding city ordinance's ban on nudity in adult entertainment establishments as "a constitutional exercise of the City's police power to combat the secondary effects of nude dancing"); <u>Schultz v. City of Cumberland</u>, 228 F.3d 831, 845–46, 848 (7th Cir. 2000) (upholding a municipal ordinance that limited the hours of operation of sexually oriented businesses and prohibited full nudity); <u>Lady J. Lingerie, Inc. v. City of</u>

10

Jacksonville, 176 F.3d 1358, 1365 (11th Cir. 1999) (upholding rules that adult entertainment establishments must have limited hours of operation and that rooms inside the establishments must be at least 1000 square feet); J.L. Spoons, Inc. v. Ohio Dept. of Pub. Safety, 31 F. Supp. 3d 933, 951 (N.D. Ohio 2014) (upholding a ban on alcohol in adult cabarets).

Thus, this case involves a recognized form of First Amendment expression, but one that the City may regulate. Applying the correct presumptions and level of scrutiny, the Court must decide whether the regulations that the City has advanced in the Ordinance are permissible or if they unconstitutionally curtail the rights of performers to engage in expressive conduct.

### A.    Count I - Constitutionality of Performer Licensing Scheme

In Count I, Plaintiffs claim that licensing provisions in the Ordinance impose an unconstitutional prior restraint on First Amendment protected speech. (Doc. 1 at 17–18). Six other counts—Counts II, IV, V, VI, XIII, and XIV—are also linked to the licensing scheme. Id. Section 150.224(a) of the Ordinance, which regulates Sinsations, states:

> (a)    Performer Work Identification Card required. Any person desiring to perform in an adult entertainment establishment licensed under this Chapter must obtain a Work Identification Card from the Sheriff. No person shall act as a performer in an adult entertainment establishment without having previously obtained said Work Identification Card, except as permitted during the Grace Period as set forth in this section.

11

> Additionally, no license holder or establishment manager shall employ, contract with or otherwise allow any performer to perform in an adult entertainment establishment who does not possess a valid and effective Work Identification Card except as permitted during the Grace Period as set forth in this section.

§ 150.224(a). Section 151.214(a) imposes the same requirement on bikini bars. Id. at 18.

Plaintiffs assert that the licensing scheme is unconstitutional due to "the City's obvious failure to incorporate any of the necessary substantive and procedural protections into its licensing regime." (Doc. 23 at 2). In particular, Plaintiffs argue that the Ordinance gives unbridled discretion to the Sheriff to approve or deny applications, lacks the necessary time limits for decisions on applications, and fails to provide an avenue for relief if the Sheriff fails to act upon applications. Id. at 8–11.

The City argues that the purpose of the Ordinance is "to safeguard against human trafficking within the City of Jacksonville by identifying those who work at establishments particularly prone to such heinous crimes and clearing workers at these establishments after a proper background investigation." (Doc. 25 at 2–3). It claims the required identification cards have "nothing to do with freedom of expression or the performances at the adult clubs" and are instead "geared toward a specific and particularly serious secondary effect of such establishments." Id. at 3. But the link between adult entertainment establishments and sex trafficking is a secondary question,

12

reached only if and when the Court determines that the procedural safeguards for a licensing scheme are satisfied. <u>See, e.g.</u>, <u>FW/PBS, Inc. v. City of Dallas</u>, 493 U.S. 215, 223 (1990) ("Because we conclude that the city's licensing regime lacks adequate procedural safeguards, we do not reach the issue . . . whether the ordinance is properly viewed as a content-neutral time, place, and manner restriction aimed at secondary effects arising out of the sexually oriented businesses.").

The constitutionality of the Ordinance's licensing scheme is first a question of whether the license required by the Ordinance is a prior restraint on First Amendment speech, and if so, whether the licensing scheme meets constitutional requirements for prior restraints. "Licensing schemes preclude expression until certain requirements are met, and therefore are prior restraints." <u>American Entertainers</u>, 888 F.3d at 720. A law that "subject[s] the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." <u>Shuttlesworth v. City of Birmingham</u>, 394 U.S. 147, 150–151 (1969). Such laws are problematic because they "make[] the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official." <u>Id.</u> at 151. Without procedural safeguards, these laws impose unlawful prerequisites to First

Amendment activity. Id. Thus, "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963); see also FW/PBS, 493 U.S. at 225.

"As a form of prior restraint, licensing schemes commonly contain two defects: discretion and the opportunity for delay." Lady J. Lingerie, 176 F.3d at 1361. First, "[a]n ordinance that gives public officials the power to decide whether to permit expressive activity must contain precise and objective criteria on which they must make their decisions; an ordinance that gives too much discretion to public officials is invalid." Id.; see also Fly Fish, 337 F.3d at 1313 (quoting Lady J. Lingerie and reiterating the reasons for which the Eleventh Circuit has declared many prior restraints unconstitutional). Second, license applications must be decided in a timely manner. "An ordinance that permits public officials to effectively deny an application by sitting on it indefinitely is [] invalid." Lady J. Lingerie, 176 F.3d at 1361–62 (citing Freedman v. Maryland, 380 U.S. 51 (1965)). Like the zoning exceptions process in Lady J. Lingerie, the licensing process here "contains both defects." Id. at 1362.

14

i.   <u>The licensing scheme improperly vests unbridled discretion in the
Sheriff to decide license applications.</u>

The Ordinance's licensing scheme fails to provide the necessary "narrow,

objective, and definite standards" to guide the Sheriff's decision. <u>Shuttlesworth,</u>

394 U.S. at 151. Sections of the Ordinance regarding the license application and

issuance process state:

> (c)   <u>Application for Work Identification Card.</u>   An
> application for a Work Identification Card shall be created by and
> obtained from the Sheriff. The Sheriff is authorized to include
> whatever information he or she deems relevant to the purposes
> established in this section for issuance of the Work Identification
> Card, including fingerprinting and photographs and proof of a valid
> and effective work permit or visa for non-U.S. citizens. Each
> applicant shall demonstrate to the Sheriff that he or she has
> completed a sex trafficking education program. Acceptable training
> programs include those developed and presented by the American
> Hotel & Lodging Association, the Polaris Project, ECPAT-USA,
> Business Ending Slavery & Trafficking and the U.S. Department of
> Homeland Security. Other programs not listed may be approved by
> the Sheriff. The application shall be in writing, signed, fully
> completed and submitted to the Sheriff together with the
> nonrefundable application fee. Each applicant must submit proof of
> identity and proof that applicant is at least twenty-one (21) years
> of age. Work Identification Cards shall not be issued to any person
> under the age of twenty[-]one. Additionally, no Work Identification
> Card shall be issued to an applicant who has been convicted of
> human trafficking or any human trafficking-related charge or who
> is currently on probation for any violation listed under subsection
> (1), below. Work Identification Cards are valid for a term of one (1)
> year. All current performers shall obtain a Work Identification
> Card within ninety (90) days from the effective date of this section
> (the "Grace Period"). Upon conclusion of the Grace Period, no
> performer shall be permitted to perform until a current Work
> Identification Card is obtained. §§ 150.224(c), 151.214(c).

(f)     Issuance of Work Identification Card. The Sheriff is responsible for verifying all information contained on a Work Identification Card application. Upon determining that the Work Identification Card should be issued, the Sheriff shall immediately render a Work Identification Card to the applicant. Said Work Identification Card shall, at a minimum, include the performer's name, photograph, and a unique card number. Should the Sheriff determine that the proof submitted with the application for the Work Identification Card as required hereinabove is not satisfactory, the Sheriff shall deny issuance of said Work Identification Card and shall provide written notification to the applicant stating the reason(s) for any such denial.

§§ 150.224(f), 151.214(f).

The Ordinance enumerates some requirements, including (1) that the applicant has taken a sex trafficking course, (2) proof of work eligibility, and (3) lack of criminal history. However, the Sheriff may include "whatever information he or she deems relevant" on the application—neither precise nor objective—and may evaluate the application as satisfactory or unsatisfactory however he or she chooses to do so. §§ 150.224(c), 151.214(c). "[V]irtually any amount of discretion beyond the merely ministerial is suspect," and the licensing scheme places much more than ministerial discretion in the hands of the Sheriff. Lady J. Lingerie, 176 F.3d at 1362.[7]

---

[7] My colleague, the Honorable Virginia M. Hernandez Covington, recently concluded that a portion of Treasure Island, Florida's sign code was unconstitutional. Florida Beach Advert., LLC v. City of Treasure Island, No. 8:19-CV-3113-T-33TGW, 2021 WL 50466, at *12 (M.D. Fla. Jan. 6, 2021). In so holding, the court cited FW/PBS, Shuttlesworth, and Lady J. Lingerie, among other cases, and emphasized that a statute is unconstitutional when "it places 'unbridled discretion in the hands of a government official.'" Id. (quoting Lamar

As written, the licensing regime conditions First Amendment activity—the ability to perform at adult entertainment establishments in Jacksonville—on the uncabined discretion of the Sheriff. This is expressly prohibited by Shuttlesworth and the long line of prior restraint cases in its wake. Shuttlesworth, 394 U.S. at 151; see also FW/PBS, 493 U.S. at 225 (concluding that a licensing requirement for sexually-oriented businesses was an unconstitutional prior restraint); American Entertainers, 888 F.3d at 722 (striking down a license-denial provision as an unconstitutional prior restraint when it "swe[pt] too broadly by requiring the police chief to choose on a case-by-case basis which particular laws to consider in evaluating applications"); Fly Fish, 337 F.3d at 1313-14 (finding an ordinance to be an unconstitutional prior restraint when it "permit[ted] city officials excessive discretion in making the licensing decision and an indefinite period of time within which to make that decision"). Thus, §§ 150.224(c), 150.224(f), 151.214(c), and 151.214(f) do not meet the first requirement for permissible prior restraints.[8]

---

Advert. Co. v. City of Douglasville, 254 F. Supp. 2d. 1231, 1327 (N.D. Ga. 2003)). Plaintiffs here submitted a Notice of Supplemental Authority in Support of Count I of their Complaint (Prior Restraint), attaching the Florida Beach Advertising case. (Doc. 38).

[8] At trial, it was discovered that, unbeknownst to the City's lawyer, the Sheriff had prepared an application for the new Worker Identification Card requirements. (Docs. 34-1 at 7–10; 36 at 53:6–54:4). However, because this is a

     ii.    <u>The licensing scheme improperly allows opportunity for delay in deciding license applications and fails to provide an avenue for relief if the application is not acted upon.</u>

Additionally, the licensing scheme lacks the requisite time constraints. "[A] prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible." <u>FW/PBS</u>, 493 U.S. at 226; <u>see also</u> <u>Vance v. Universal Amusement Co.</u>, 445 U.S. 308, 316 (1980). As in <u>FW/PBS</u>, "the city's regulatory scheme allows indefinite postponement of the issuance of a license." 493 U.S. at 227. The Ordinance does not prescribe any period within which the Sheriff must approve or deny a license application.[9] Thus, applicants may be unable to exercise their First Amendment right to perform indefinitely. Under Supreme Court precedent, there must be a time limit for the Sheriff to act. "Where the licensor has unlimited time within which to issue a license, the risk of arbitrary suppression is as great as the provision of unbridled discretion. A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech." <u>Id.</u>; <u>see also</u> <u>Riley v. Nat'l Fed'n of Blind of N.C., Inc.</u>, 487 U.S. 781, 802 (1988)

---

facial challenge to the Ordinance, the Court does not consider the content of the application.

    [9] In an affidavit submitted shortly before trial, Assistant Chief Stephen Gallaher stated that the Sheriff's office established an administrative policy that applications must be approved within fourteen days. (Docs. 34-1 at 3, 36 at 114:5–11). An internal administrative policy, however, is not a substitute for a designated time frame on the face of the Ordinance.

("[D]elay compels the speaker's silence. Under these circumstances, the licensing provision cannot stand.").

Relatedly, the licensing scheme does not provide for preservation of the status quo while license applications are processed, nor does it give an appropriate avenue of review or appeal if no action is taken on an application. See §§ 150.224, 151.214. In a constitutional licensing scheme, not only must the licensor make decisions on applications in a fixed, reasonable time, but also, the status quo must be maintained during that time. See, e.g., FW/PBS, 493 U.S. at 228. Though the Ordinance provides for an initial ninety-day grace period, it does not allow performers to continue performing if they do not receive a license decision within that time. See §§ 150.224, 151.214. In Artistic Entertainment, Inc. v. City of Warner Robins, the Eleventh Circuit reviewed a licensing scheme that required decisions to be made in forty-five days but was "silent on an applicant's right to begin operating his business if the city fails to act on his application." 223 F.3d 1306, 1311 (11th Cir. 2000). The Eleventh Circuit found the licensing scheme unconstitutional because it did not guarantee the applicant "the right to begin expressive activities within a brief, fixed time frame." Id. Similarly here, a performer might apply for a license but if the Sheriff does not act on the application within the ninety-day grace period, the performer is prohibited from continuing to perform. The licensing scheme must

19

include not only time constraints, but also directives for maintaining the right to perform if the City does not act.

Finally, the Ordinance does not provide a means of relief if the Sheriff fails to act on an application. While the Ordinance provides an appeal process when a license is denied, the Ordinance is silent as to what happens if the Sheriff takes no action on an application. See §§ 150.224(h), 151.214(h). An avenue of plenary review and prompt judicial decision making are necessary if an application is denied <u>or</u> is not acted upon in the first place. <u>City of Littleton v. Z.J. Gifts D-4, LLC</u>, 541 U.S. 774, 779–80 (2004) (analyzing <u>FW/PBS</u> and emphasizing that judicial review prevents undue delay and must necessarily be prompt in adult business licensing schemes).[10]

If Jacksonville seeks to impose a licensing requirement for performers at adult entertainment establishments, the licensing procedure must adhere to each of the requirements that the Supreme Court has laid out. The Ordinance's

---

[10] The cases the City cites as upholding performer licensing schemes are distinguishable. In <u>Discopolus LLC v. City of Reno</u>, No. 3:17-cv-00574-MMD-VPC, 2017 WL 6378969, at *6–7 (D. Nev. Dec. 13, 2017), the plaintiffs alleged only that the challenged licensing scheme chilled protected speech and was vague. <u>Id.</u> The court specifically noted that procedural safeguards were not at issue and concluded that the plaintiffs had failed to state a valid claim for violation of the First Amendment. <u>Id.</u> at *7. Both <u>35 Bar and Grille, LLC v. City of San Antonio</u>, 943 F. Supp. 2d 706 (W.D. Tex. 2013) and <u>Platinum Sports Ltd. v. City of Detroit</u>, 641 F. Supp. 2d 627, 632–33 (E.D. Mich. 2009) involved licensing requirements for clubs, not performers, and those courts did not analyze procedural safeguards necessary for prior restraints.

licensing provisions do not. Sections 150.224 and 151.214 of the Ordinance are therefore invalid under the First and Fourteenth Amendments. The Court finds in favor of Plaintiffs as to Count I.[11]

### B.   Count II – Constitutionality of Performer License Application Requirements

Plaintiffs take issue with several requirements for license applicants: Applicants must submit fingerprints and a photograph, participate in a human trafficking training program, and provide proof of citizenship or work eligibility, while clubs must maintain dancer rosters and work card files. §§ 150.224(c), 150.224(g), 151.214(c), 151.214(g). Plaintiffs argue that these requirements curtail speech without being narrowly tailored to advance the substantial government interest of preventing human trafficking. (Doc. 23 at 12).

The City points to human trafficking prevention as the reason behind its performer application requirement. Indeed, "[h]armful secondary effects can include the impacts on public health, safety, and welfare" caused by adult

---

[11] A constitutional licensing scheme may be possible. Indeed, this point was conceded by Plaintiffs at trial. (Doc. 36 at 51:3–6). Courts have found that procedural safeguards were satisfied in various licensing schemes. Cf., Cafe Erotica of Fla., Inc. v. St. Johns Cty., 360 F.3d 1274, 1282–83 (11th Cir. 2004) (finding that a licensing scheme satisfied time limit and prompt judicial review requirements, though it was ultimately unconstitutional for unbridled discretion); see also Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1269–72 (11th Cir. 2005) (discussing the Eleventh Circuit's decisions in various licensing cases).

entertainment establishments, and the City is well within its bounds in legislating to prevent human trafficking. Doe I., 909 F.3d at 108, 110 (quoting Pap's A.M., 529 U.S. at 291). While preventing human trafficking is a substantial government interest, the issue is whether the application requirements that Plaintiffs challenge are narrowly tailored toward that end.

"Licensing, though functioning as a prior restraint, is constitutionally legitimate when it complies with the standard for time, place or manner requirements." Schultz, 228 F.3d at 851 (citing Cox v. New Hampshire, 312 U.S. 569, 575–76 (1941)). Regulations on the time, place, or manner of expressive activity are permissible when they are narrowly tailored to serve a significant government interest that is unrelated to the suppression of protected expression and alternative channels are left open for communication. See, e.g., id.; KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1268–69 (11th Cir. 2006). Regulations are narrowly tailored when they "promote[] a substantial government interest that would be achieved less effectively absent the regulation." Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989) (quoting United States v. Albertini, 472 U.S. 675, 689 (1985)). "To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its

goals." Id. Here, the licensing requirements in the Ordinance fall into two categories—those that are demonstrably related to preventing human trafficking, and those that are not.

First, in other contexts, courts agree that fingerprinting requirements tend to go too far in licensing regimes. The cases that analyze fingerprinting are not directly on point because they do not involve licensing for adult entertainment performers to combat human trafficking. Nevertheless, the constitutional principles in those cases apply here, including that there exists little to no relationship between fingerprinting and the City's stated objective and that fingerprinting is often held to be an impermissible burden as a condition to First Amendment activity. See Schultz, 228 F.3d at 852 ("[W]e invalidate the required production of . . . fingerprints . . . . [as] redundant and unnecessary for Cumberland's stated purposes. Its required disclosure serves 'no purpose other than harassment' . . . because it is not narrowly tailored to the government's interests in the time, place or manner of adult entertainment."); see also New Jersey Citizen Action v. Edison Twp., 797 F.2d 1250, 1265 (3d Cir. 1986) ("[W]hen identification and disclosure requirements have been shown to burden First Amendment rights, the government must show that there is a substantial relation between the regulation and some legitimate and important state interest."); Genusa v. City of Peoria, 619 F.2d 1203, 1216 (6th Cir. 1980) ("[T]hese [fingerprinting] provisions cannot be

sustained as furthering the state interest shown by this record. Because they invade plaintiffs' privacy without any legitimate justification, they are prohibited by the First and Fourteenth Amendments.").

At trial, Plaintiffs argued that the City's interest is in identifying performers to ensure that they are over eighteen, but that fingerprinting is not necessary for that task. (Doc. 36 at 144:2–11). The City argued that the fingerprint requirement is necessary to distinguish between performers who are twins (Doc. 36 at 198:1–9), but that seems unrelated to the City's age requirement (which is discussed below) and corresponding prevention of human trafficking. [12] Identification is possible through a driver's license or other identification card. The Court does not take issue with the photo requirement, as a photo is a less intrusive, more standard way of verifying identity if an appropriate licensing regime were put in place.

---

[12] Because the City's main justifications for the fingerprinting requirement are identification and age, the Court does not address whether there may be other defensible rationales for a fingerprinting requirement in a licensing scheme. At trial, the City briefly mentioned but did not develop the role of fingerprinting in conducting criminal background checks. (Doc. 36 at 198:8–9). While there may still be constitutional issues with that rationale, the Court does not address it further. Cf. Pacific Frontier v. Pleasant Grove City, 414 F.3d 1221, 1231–37 (10th Cir. 2005); (Brownell v. City of Rochester, 190 F. Supp. 2d 472, 494–96 (W.D.N.Y. 2001). If the City were to identify over time a pattern of applicants using fraudulent identification, the Court does not rule out that the City might be able to legislate additional identification methods.

The requirement that performers present proof of participating in a human trafficking training program is not <u>per se</u> unconstitutional; it is legitimately related to the City's goal of preventing human trafficking. The City need not determine the least restrictive, least burdensome, most appropriate method possible to combat human trafficking and adopt it; the City need only ensure that any method it selects is tailored toward its legitimate interest in combatting human trafficking and is not overly burdensome. <u>Ward</u>, 491 U.S. at 799. However, whether the requirement is overly burdensome depends on the type of training program. Though the Ordinance specifies five such programs,[13] facts are not before the Court regarding the cost, time commitment, and setting (online or in-person) of those programs. <u>See</u> §§ 150.224(c), 151.214(c). Thus, the Court defers the issue of the constitutionality of the human trafficking training course requirement for the reconvened trial.

Finally, the requirement that performers provide proof of citizenship or right to work is not legitimately related to preventing human trafficking. According to the City, these requirements "ensure[] that potential victims and traffickers, either of whom could be from a foreign country, can be identified at

---

[13] The Ordinance states that "[a]cceptable training programs include those developed and presented by the American Hotel & Lodging Association, the Polaris Project, ECPAT-USA, Business Ending Slavery & Trafficking and the U.S. Department of Homeland Security. Other programs not listed may be approved by the Sheriff." §§ 150.224(c), 151.214(c). The nature of these programs was not discussed at trial.

all times." (Doc. 25 at 7). But the City has made little connection between proof of citizenship and combatting human trafficking. Of course, verification of work eligibility may be a proper component of adult entertainment establishments' employee screening (and may even be required by federal immigration law), but the City cannot require this information as part of a licensing scheme when it shows insufficient relationship to human trafficking.[14] Clubs maintaining rosters, on the other hand, is a permissible way to keep track of licensed performers, secondary to combatting human trafficking.

Thus, the requirements of a photograph and dancer roster and work card files in §§ 150.224(c), 150.224(g), and 151.214(c), and 151.214(g) may stand. The requirements of fingerprints and proof of work eligibility may not, and the requirement of proof of participation in a human trafficking course is preserved for trial at a later date. Permanent injunctive relief as to Count II is granted in part, denied in part, and deferred in part.

---

[14] If the City were able to muster evidence of a connection between human trafficking and citizenship status, it might be able to require proof of citizenship, but it has not done so here. Indeed, the City stated in a "whereas" clause to the Ordinance that "researchers have found that sex trafficking victims are more likely to be trafficked by someone from within her or his own community[.]" (Doc. 1-1 at 3). This seems contrary to the idea that human trafficking is tied to immigration.

C.    **Counts IV and VI - Constitutionality of Performer Age Restriction**

The age restriction issue needs more development. The Ordinance restricts the age of performers at adult entertainment establishments to twenty-one and older. §§ 150.224(c), 151.214(c). The Ordinance imposes that restriction in a "roundabout" way, through the licensing scheme. (Docs. 1-1, 36 at 20:7–16). Instead of issuing an outright age limit for performers, the Ordinance requires work authorization cards for all performers, and within its description of work authorization card procedures (i.e., the licensing scheme), the Ordinance disallows those under twenty-one from receiving a work authorization card:

> Each applicant must submit proof of identity and proof that applicant is at least twenty-one (21) years of age. Work identification cards shall not be issued to any person under the age of twenty one [sic].

§§ 150.224(c), 151.214(c). Lest there be any doubt that the Ordinance is meant to impose an age restriction, the City Council expressed its intent "to prohibit adult entertainment performers under age twenty-one." (Doc. 1-1 at 1). Plaintiffs claim that the age restriction is not narrowly tailored (Count IV) and is underinclusive (Count VI) under the First Amendment.

The City asks the Court to uphold a complete ban on performing at adult entertainment establishments in Jacksonville for those under twenty-one years

old. The Court believes it is the first to consider upholding such a ban, which raises a number of issues about which the Court needs further guidance. Those issues include but are not limited to: (1) whether any court has ever upheld or struck down such a ban; (2) the precise nature of the restriction that was upheld by the Fifth Circuit in <u>Doe I</u>, 909 F.3d 99 (which was less than a total ban), and whether the reasoning of <u>Doe I</u> is fully applicable to the Ordinance;[15] (3) whether the evidence the City adduced at trial about the relationship between age and human trafficking was presented to the City Council at the time it was considering the Ordinance, and whether that matters; (4) whether the City considered any less restrictive age-based alternatives; (5) whether other age restrictions such as those on purchasing alcohol or owning firearms are relevant to this analysis; (6) whether the Court should allow an evidentiary record, including trial testimony, to be developed before ruling on the issue, or if allowing additional evidence is inconsistent with deciding a facial challenge;

---

[15] In <u>American Entertainers</u>, 888 F.3d at 722–23, the Fourth Circuit upheld a ban on those under twenty-one being owners, officers, or directors of a sexually-oriented business. The court "decline[d] to recognize a First Amendment right for eighteen- to twenty-one year olds to own an adult business" and therefore applied rational basis review. <u>Id.</u> at 723. The court found that the age restriction was "rationally related to Rocky Mount's interest in ensuring that sexually-oriented-business owners are of legal drinking age, given alcohol's availability at most such venues." <u>Id.</u> Does the teaching of <u>American Entertainers</u> have any bearing on the age restriction in this case?

and (7) any other relevant arguments. The Court will allow the parties to brief these issues and then take the age restriction up at the reconvened trial.

**D.    Count V - Constitutionality of Performer License Fees and Club License Fees**

Sections 150.224(e) and 151.214(e) of the Ordinance impose a $150.00 fee on performers to apply for a Work Identification Card and to annually renew the card:

> (e)    <u>Fees.</u> The applicant shall pay an application fee with each new request for a Work Identification Card and with each renewal of a Work Identification Card. The fees shall not be prorated. The applicant shall also pay a duplicate card fee for each duplicate copy of an existing Work Identification Card. The initial and renewal application fee shall be $150. The fee for issuance of a duplicate Work Identification Card shall be $50. Fees are non-refundable.

Additionally, the Ordinance authorizes an increase of the fee for Club Plaintiffs' business licenses to $2500. § 9 ("Authorizing Fee Increase," modifying §§ 150.215 and 151.212).

Plaintiffs claim that "those fees represent an unconstitutional tax on speech because they are imposed only against businesses and individuals engaged in expressive conduct (dance) and the fee charged exceeds the cost of administering the licensing program." (Doc. 23 at 22). The City responds that the fees are not unconstitutional taxes on speech because the fees are "reasonable to administer and enforce the provisions of Chapters 150 and 151,

29

which are clearly meant to combat the secondary effects associated with adult businesses, including the investigation and prevention of the very serious problem of human sex trafficking." (Doc. 25 at 18–19).

In <u>Fly Fish</u>, the Eleventh Circuit confirmed that Supreme Court guidance on licensing fees generally applies to licensing fees on adult entertainment. 337 F.3d at 1314; <u>see</u> <u>Murdock v. Pennsylvania</u>, 312 U.S. 105, 113–14 (1943); <u>Cox</u>, 312 U.S. at 577. "[W]hen core First Amendment freedoms are made subject to a licensing scheme, only revenue-neutral fees may be imposed so that government is not charging for the privilege of exercising a constitutional right." <u>Fly Fish</u>, 337 F.3d at 1314. The burden rests with the government to show that a licensing fee is "reasonably related to recoupment of the costs of administering the licensing program." <u>Id.</u>[16]

Here, the City must show that the cost of processing applications and maintaining its regulatory framework justifies its licensing fee. "In each of the

_____

[16] As the Eleventh Circuit highlighted, the Eighth Circuit diverges from this view "because adult entertainment—nude dancing—is not a 'core' First Amendment freedom and does not enjoy more than 'marginal' constitutional protection." <u>Fly Fish</u>, 337 F.3d at 1314; <u>see</u> <u>Jakes, Ltd., Inc. v. City of Coates</u>, 284 F.3d 884, 890-891 (8th Cir. 2002). In <u>Fly Fish</u>, the district court had upheld a licensing fee on adult entertainment without comment. <u>Id.</u> Upon review, the Eleventh Circuit "[could not] do the same," reasoning that the Supreme Court "made clear that a law aimed at suppressing this protected conduct [nude dancing] would violate the First Amendment," and therefore, cases about taxing the exercise of First Amendment protected expressive conduct apply. <u>Id.</u> at 1314–15.

cases sustaining licensing fees against [F]irst [A]mendment attack, the licensing authority had been able to demonstrate that the fees were necessary to cover the reasonable costs of the licensing system, and that the fees were used for no other purpose than to meet those costs." Bayside Enterprises, Inc. v. Carson, 450 F. Supp. 696, 705 (M.D. Fla. 1978). Without an evidentiary record sufficient to support the claim that the licensing fee is reasonable, courts have held such licensing fees unconstitutional. See Fly Fish, 337 F.3d at 1315.[17]

In its brief, the City stated that "to the extent this Court determines that evidence is needed to demonstrate the reasonableness of the City's fees, this issue should be determined at a later date as it cannot be decided as a matter of law . . ." (Doc. 25 at 18 n.8). Then, the day before trial, the City filed an affidavit and additional documents regarding the costs associated with

---

[17] Additionally, the Sixth Circuit has said:

When the licensing scheme is imposed to combat "secondary effects," . . . the Court is to consider three questions: (1) whether the fee's maximum amount will deter the exercise of First Amendment rights, (2) whether the measures the cost of which the County seeks to transfer to licensees via its fee structures are narrowly tailored means of advancing the County's interest in curbing secondary effects, and (3) whether the County's cost estimates for those measures are reasonable.

Platinum Sports, Ltd. v. City of Detroit, 641 F. Supp. 2d 627, 635 (E.D. Mich. 2009) (quoting 729, Inc. v. Kenton County Fiscal Court, 515 F.3d 485, 501-05 (6th Cir. 2008)). The Eleventh Circuit has not explicitly adopted this three-part test, but cost estimates are an essential component of whether fees are appropriate.

implementing and enforcing the licensing regime. (Docs. 33, 34). At trial, Plaintiffs' counsel requested that the newly-submitted evidence be excluded. Counsel stated that "if it is excluded, the City would not have met its burden. If the Court is going to allow that, then what I would say is we would want to have an evidentiary proceeding to be able to challenge that." (Doc. 36 at 176:6–9).[18]

Evidence is indeed necessary to determine whether the City's fees are reasonable. In the absence of such evidence, the reasonableness of the fees cannot be assessed at this stage. Thus, the Court will not rule on §§ 150.224(e) and 151.214(e), which concern the licensing fee for performers, or on § 9, which imposes an increase in the licensing fee for adult entertainment business licenses. Both sides will be able to present evidence on this issue at the reconvened trial. In the meantime, the Court understands that the City will continue to abate enforcement of these provisions. The Court defers ruling on Count V.

---

[18] Plaintiffs' counsel also brought an ore tenus motion at trial to strike the affidavits. (Doc. 36 at 16:3–6). The motion is denied, but Plaintiffs' alternative request to defer the issue for a later evidentiary proceeding is granted.

**E.     Count VII - Constitutionality of Performer Record Searches**

Plaintiffs claim that the Ordinance allows for warrantless inspections of Club Plaintiffs' performer records. Sections 150.224(g) and 151.214(g) mandate that:

> The performer roster and the Work Identification Card file shall be made available to the Sheriff for inspection and/or copying upon request.

Administrative searches are not subject to the same warrant requirements as typical searches and seizures. See, e.g., Camara v. Municipal Court of City & Cty. of San Francisco, 387 U.S. 523, 537–39 (1967). Still, administrative inspections must adhere to the mandates of the Fourth Amendment. Id.; see also Airbnb, Inc. v. City of New York, 373 F. Supp. 3d 467, 483 (S.D.N.Y. 2019) (reiterating well-settled law that that "the Fourth Amendment's protection of 'papers' includes business records"). Businesses generally have an expectation of privacy in their business records, but that expectation is lessened for closely regulated businesses. See New York v. Burger, 482 U.S. 691, 702 (1987); Three criteria must be satisfied for administrative searches of closely regulated businesses:

> (1) [T]here must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made; (2) the warrantless inspections must be necessary to further [the] regulatory scheme; and (3) the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.

33

City of Los Angeles v. Patel, 576 U.S. 409, 426 (2015) (quoting Burger, 482 U.S. at 702–03) (internal quotations omitted) (alterations in original).

The parties disagree about whether adult entertainment establishments are closely regulated businesses for the purposes of Fourth Amendment administrative search standards. (Docs. 23 at 23 n.18, 25 at 22). Their disagreement is understandable, as the Supreme Court has not directly opined whether adult entertainment is a closely regulated industry, and the issue appears to be unsettled among lower courts. Compare Free Speech Coal., Inc. v. Att'y Gen. United States, 825 F.3d 149, 169–70 (3d Cir. 2016) ("The pornography industry, like the hotel industry in Patel, is not subjected to a level of regulation even approximating the pervasive regulation aimed at the liquor industry . . ."), with Club Madonna v. City of Miami Beach, No. 16-25378-CIV-MORENO, __ F. Supp. 3d __, 2020 WL 6589363, at *5 (S.D. Fla. Nov. 10, 2020) ("Nude dancing clubs like Club Madonna have long been pervasively regulated.").[19]

The Honorable Federico A. Moreno in the Southern District of Florida recently analyzed a nearly identical inspection scheme in Club Madonna, 2020

---

[19] All Club Plaintiffs except Sinsations serve alcohol, and the liquor industry is closely regulated.

WL 6589363. [20] There, Judge Moreno concluded that adult entertainment establishments are closely regulated businesses, that the corresponding more relaxed standard for administrative searches applies, and that surprise inspections were necessary to further the goals of the ordinance—which included combatting human trafficking. Id. at *5–6. The Court relied on evidence showing that when surprise inspections were in use, the club complied with the human trafficking ordinance, but when they were not, the club stopped complying. Id. Club Madonna is not binding on this Court, but the decision provides an instructive summary of the relevant law.[21]

Because, unlike Club Madonna, no evidence is before the Court regarding the connection between records inspections and human trafficking prevention, the Court is unable to rule on this issue at this time. The Court defers ruling on Count VII.

---

[20] The Ordinance in Club Madonna provided: "[t]he documents referenced in subsections (1) through (5) must be available for inspection by the city upon demand, and the nude dance establishment shall not refuse access to these documents for inspection by the city." Club Madonna, 2020 WL 6589363, at *9.

[21] The Club Madonna decision is currently on appeal. See Club Madonna v. City of Miami Beach, No. 20-14292 (11th Cir. 2020).

**F.     Count XIII - Whether Allowing Sheriff to Evaluate Work Status Is Preempted by Federal Law**

In Count XIII, Plaintiffs allege that §§ 150.224(c), 150.224(f), 151.214(c), and 151.214(f) of the Code, which allow the Sheriff to verify the work status of employees, are preempted by the Immigration Reform and Control Act of 1986 (IRCA), 8 U.S.C.A. §§ 1324(a) and 1324(b).

The IRCA preempts the Ordinance's provisions that allow for work status evaluation. See Lozano v. City of Hazelton, 724 F.3d 297, 307 (3d Cir. 2013) (finding that IRCA applied to employees and not independent contractors but concluding that the ordinance in question was preempted because it did not distinguish between the two); Club Madonna, 2020 WL 6589363, at *8 (citing Lozano and finding that a law requiring clubs to evaluate work status was preempted by IRCA and invalid under the Supremacy Clause). Though IRCA does not apply to independent contractors, the City states that the licensing scheme regulates all performers, regardless of whether they are independent contractors or employees. (Doc. 25 at 32 n.10). Thus, the independent contractor exception does not assist the City.

The City claims that the language of IRCA carves out licensing schemes from preemption: "The provisions of this section pre-empt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer a fee for employment,

36

unauthorized aliens." 8 U.S.C.A. § 1324(a)(h)(2) (emphasis added). But this does not abrogate preemption concerns. <u>Club Madonna</u> is instructive:

> Even though [IRCA] only mentions <u>express preemption</u>, the City argues that because the Ordinance should be considered a 'licensing or similar law,' that it cannot be <u>conflict preempted</u> either. This is not so. Assuming without deciding that the Ordinance is a 'licensing [or] similar law,' and thus falls within the savings clause, the Court still finds the Ordinance to be conflict preempted. The savings clause saves the Ordinance from express preemption, but not all preemption. <u>Geier v. Am. Honda Motor Co.</u>, 529 U.S. 861, 869 (2000) ('We now conclude that the saving clause (like the express pre-emption provision) does <u>not</u> bar the ordinary working of conflict pre-emption principles.').

2020 WL 6589363, at *7 (emphasis in original). Plaintiffs point out additional potential conflicts: that the Ordinance imposes criminal penalties for violation of verification requirements in § 151.214(b) when federal law only permits local government enforcement of such provisions through license denials, suspensions, and revocations, and that federal law allows for a wider range of identification not allowed by the Ordinance. <u>See</u> 8 U.S.C.A. § 1324(a)(h)(2); 8 C.F.R. § 274a.2(b)(1)(v)(A); 8 C.F.R. § 274a.2(b)(v)(C); Doc. 23 at 33–24. The City does not respond to these allegations, choosing instead to emphasize that the Ordinance is exempt as a licensing scheme.

Sections 150.224(c), 150.224(f), 151.214(c), and 151.214(f) are pre-empted by IRCA. The Court grants permanent injunctive relief as to Count XIII.

### G.    Count XIV - Whether the Performer Age Restriction is Preempted by Florida Law

Plaintiffs argue that the ban against performers under twenty-one is preempted by § 562.13, FLA. STAT.[22] The statute provides exceptions to the

---

[22] 562.13   Employment of minors or certain other persons by certain vendors prohibited; exceptions.—

(1)   Unless otherwise provided in this section, it is unlawful for any vendor licensed under the Beverage Law to employ any person under 18 years of age.

(2)   This section shall not apply to:

(a)   Professional entertainers 17 years of age who are not in school.

(b)   Minors employed in the entertainment industry, as defined by s. 450.012(5), who have either been granted a waiver under s. 450.095 or employed under the terms of s. 450.132 or under rules adopted pursuant to either of these sections.

(c)   Persons under the age of 18 years who are employed in drugstores, grocery stores, department stores, florists, specialty gift shops, or automobile service stations which have obtained licenses to sell beer or beer and wine, when such sales are made for consumption off the premises.

(d)   Persons 17 years of age or over or any person furnishing evidence that he or she is a senior high school student with written permission of the principal of said senior high school or that he or she is a senior high school graduate, or any high school graduate, employed by a bona fide food service establishment where alcoholic beverages are sold, provided such persons do not participate in the sale, preparation, or service of the beverages and that their duties are of such nature as to provide them with training and knowledge as might lead to further advancement in food service establishments.

(e)   Persons under the age of 18 years employed as bellhops, elevator operators, and others in hotels when such employees are engaged in work apart from the portion of the hotel property where alcoholic beverages are offered for sale for consumption on the premises.

(f)   Persons under the age of 18 years employed in bowling alleys in which alcoholic beverages are sold or consumed, so long as such minors do not participate in the sale, preparation, or service of such beverages.

(g)   Persons under the age of 18 years employed by a bona fide dinner theater as defined in this paragraph, as long as their employment is limited to the services of an actor, actress, or musician. For the purposes of this paragraph, a

38

general rule that vendors who sell alcohol may not employ minors. § 562.13. Plaintiffs claim that "the exception proves the rule" because Plaintiffs are not minors, and those performing in clubs serving alcohol are not nude. (Doc. 23 at 34).

Plaintiffs' arguments are unavailing. The statute provides exceptions in which minors may work at establishments that sell alcohol; there is no express provision about how those ages eighteen to twenty-one may or may not be employed. Plaintiffs cite City of Hollywood v. Mulligan, 934 So. 2d 1238, 1246– 47 (Fla. 2006) (quoting Thomas v. State, 614 So. 2d 468, 470 (Fla. 1993)) ("[A] municipality cannot forbid what the legislature has expressly licensed, authorized, or required, nor may it authorize what the legislature has expressly forbidden."). But the Florida legislature did not speak to whether eighteen to twenty year olds may perform at adult entertainment establishments in § 562.13, and as such, it did not preclude localities from age-based regulations.

---

dinner theater means a theater presenting consecutive productions playing no less than 3 weeks each in conjunction with dinner service on a regular basis. In addition, both events must occur in the same room, and the only advertised price of admission must include both the cost of the meal and the attendance at the performance.

(h)   Persons under the age of 18 years who are employed in places of business licensed under s. 565.02(6), provided such persons do not participate in the sale, preparation, or service of alcoholic beverages.

## III.   OTHER ISSUES

### A.   Count III - Constitutionality of Club License Suspension and Revocation Procedures

Operating an adult business in Jacksonville requires a business license. § 150.203. (Businesses licenses should not be confused with the performer work identification cards that are the subject of most analysis herein.) Plaintiffs challenge §§ 150.212(b) and 151.208(e), which provide suspension and revocation procedures for business licenses:

> Before the Sheriff shall suspend or revoke a license, he shall furnish the licensee a written statement, by certified or registered mail or by personal service, of the cause for suspension or revocation of the license and the length of time of suspension. The Sheriff shall within 20 days of notification, refer the matter to a county court judge, who shall hold a hearing for the sole purpose of determining whether just cause exists for the suspension or revocation. For purposes of this subsection, a violation shall be deemed committed, by the county court judge, based upon clear and convincing evidence submitted at the hearing. A finding of violation at a suspension or revocation hearing shall not establish precedent or be used in any civil or criminal penalty proceeding. This suspension or revocation process is intended to apply retroactively to all adult entertainment licenses currently existing and to those prospectively issued hereinafter. The suspension or revocation of a license shall not become effective until the Sheriff obtains a final order authorizing the suspension or revocation or the parties stipulate otherwise. In any judicial review, whether review is brought by the applicant or the Sheriff, the Sheriff shall have the burden of demonstrating the validity of the proposed suspension or revocation.

§ 150.212(b). Plaintiffs do not object to the provision regarding the Sheriff's written statement as to the cause of suspension or revocation and the length of

suspension. (Doc. 23 at 13). But they do attack the subsequent portions of §§ 150.212(b) and 151.208(e), which mandate that the Sheriff refer the matter to a county judge, that the judge hold a hearing to determine "just cause" by clear and convincing evidence, and that the judge issue an opinion with no precedential value. Id. at 13–17.

Municipalities in Florida may not specify procedures to be used by Florida courts. That is the role of the Florida Supreme Court alone, and any arrangement to the contrary raises separation of powers concerns. See FLA. CONST. Art. V § 2(a). The Florida Constitution grants the Florida Supreme Court "the exclusive authority to adopt rules of judicial practice and procedure for actions filed in this State, while the Legislature is charged with the responsibility of enacting substantive law." Southeast Floating Docks, Inc. v. Auto-Owners Ins. Co., 82 So. 3d 73, 78 n.4 (Fla. 2012). Judicial "practice and procedure encompass the course, form, manner, means, method, mode, order, process or steps by which a party enforces substantive rights or obtains redress for their invasion." Haven Fed. Sav. & Loan Ass'n v. Kirian, 579 So. 2d 730, 732 (Fla. 1991) (internal quotation marks omitted).

Plaintiffs aver that "the procedures envisioned by the City are unworkable . . . given the non-precedential nature of the 'just cause' determination and the mystery of how one proceeds from that possibly ex parte application to a 'final order' of revocation." (Doc. 23 at 17). The Court agrees.

41

The Court understands the City's effort to ensure that business license suspensions and revocations are handled properly, but this scheme does not comport with Florida law. The City may issue guidelines to law enforcement regarding civil citations to enforce the Code, but it may not craft its own procedure for Florida courts.

The City is correct that license suspension or revocation procedures must afford due process to licensees. Licenses are "not to be taken away without that procedural due process required by the Fourteenth Amendment," and a State must afford "notice and opportunity for hearing appropriate to the nature of the case before the termination becomes effective." Bell v. Burson, 402 U.S. 535, 542 (1971) (internal citations omitted). However, this scheme violates Florida law.[23] The Court finds in favor of Plaintiffs as to Count III.

## B.  Count VIII – Constitutionality of Prohibiting "Simulate[d] Sexual Activity"

Section 150.606(e) of the Jacksonville Code forbids the simulation of sexual activity with other people at adult entertainment establishments:

---

[23] There may be a permissible arrangement that involves an administrative officer, a City Council committee, an independent Board, or even a judge. The Court does not attempt to define the parameters of a lawful review process. The previous version of the Code provided for binding arbitration as a means of handling licensing disputes. The plaintiff in Stadium Club, No. 3:20-cv-00020-TJC-JRK, a related case, claimed that process was unconstitutional. The arbitration procedure is not at issue here.

> (e)   It shall be unlawful for any entertainer, performer or employee, while on the premises of a commercial establishment regulated under this Part, to dance in such a manner as to simulate sexual activity with any patron, spectator, employee or other person not employed therein.

Section 150.606(f) provides for a similar prohibition:

> (f)   It shall be unlawful for any entertainer, performer or employee, while on the premises of a commercial establishment regulated under this Part, to sit upon or straddle the leg, legs, lap, or body of any patron, spectator or other person therein, or to engage in or simulate sexual activity while touching or being touched by such patron, spectator or other person.

These provisions are not recent amendments to the Code. Still, Plaintiffs claim that the phrase "simulate sexual activity" is unconstitutionally vague, overbroad, and not narrowly tailored. (Doc. 23 at 27).

> i.   Sections 150.606(e) and 150.606(f) are not vague.

A statute is impermissibly vague when "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000). Procedural due process requires that laws give "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." Jordan v. DeGeorge, 341 U.S. 223, 231 (1951). An ordinary person with common sense should be able to comprehend and comply with a statute that is not unconstitutionally vague. See Giovani Carandola, Ltd. v. Fox, 470 F.3d 1074,

1079 (4th Cir. 2006) ("<u>Giovani II</u>") (citing <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 608 (1973)). In First Amendment context, vague laws are especially problematic when they operate to inhibit free expression. See <u>Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.</u>, 455 U.S. 489, 499 (1982); <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108–09 (1972).

Many courts have held that the word "simulate" in this context is not vague.[24] <u>See, e.g.</u>, <u>Giovani II</u>, 470 F.3d at 1080–81 (reversing a district court's

---

[24] The Fourth Circuit in <u>Giovani II</u> elaborated on this point:

> [T]he dictionary precisely defines "simulate" as a verb meaning "to make a pretense of; feign ... [or] to assume or have the appearance or characteristics of." <u>Webster's New Universal Unabridged Dictionary</u> 1783 (1996). The Supreme Court and many other courts have held that the word 'simulate' is sufficiently clear when used in similar statutory prohibitions. <u>See, e.g.</u>, <u>New York v. Ferber</u>, 458 U.S. 747, 765, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (holding that a statute defining forbidden content, in part, as "actual or simulated sexual intercourse" "sufficiently describes" the prohibited material); <u>Miller v. California</u>, 413 U.S. 15, 25, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (noting that "ultimate sexual acts" whether "actual or simulated" constitute a "plain example[ ] of what a state statute could define for regulation" as obscene); <u>United States v. Adams</u>, 343 F.3d 1024, 1034–36 (9th Cir. 2003) (upholding against vagueness challenge a statute prohibiting the possession of materials depicting a minor engaged in "sexually explicit conduct," which includes "simulated" acts); <u>Farkas v. Miller</u>, 151 F.3d 900, 901, 905 (8th Cir. 1998) (upholding against vagueness challenge a statute prohibiting "the actual or simulated public performance of any sex act" because "[p]ersons of ordinary intelligence would not be confused as to the . . . meaning of the term[ ] 'simulated sex act'"). Indeed, [plaintiff] fails to cite, and we have not found, a case in which any court has held "simulate" vague in a similar context.

holding that "simulates [sexual acts]" was unconstitutionally vague); see also Hamilton v. Roberts, 165 F.3d 27 (Table), No. 97-1696, 1998 WL 639158, at *7 (6th Cir. Sept. 10, 1998); Imaginary Images, Inc. v. Evans, 593 F. Supp. 2d 848, 861 (E.D. Va. 2008); Bright Lights, Inc. v. City of Newport, 830 F. Supp. 378, 388–89 (E.D. Ky. 1993). The Court adopts the reasoning of the Fourth Circuit in Giovani II on this point. By their nature, terms like "simulate" and "sexual activity" are not perfectly precise, but the law does not require "mathematical certainty" from statutory language. [25] See Grayned, 408 U.S. at 110. Sections 150.606(e) and 150.606(f) give sufficient opportunity for ordinary people to understand what conduct is prohibited.

---

We too conclude that in context 'simulate' is sufficiently precise to notify persons of ordinary intelligence of the conduct prohibited by the statute and to prevent the risk of arbitrary or discriminatory enforcement. As [defendant] notes, '[T]here is a distinct and very real difference between a gesture that may, in the abstract, symbolize sexual intercourse (such as gyrating one's hips) and an act that causes the audience to believe that they are actually observing sexual intercourse.' An act only constitutes simulated sexual intercourse or simulated masturbation if it creates the realistic impression of an actual sexual act.

Giovani II, 470 F.3d at 1080 (emphasis in original).

[25] The Code does make an effort to define sexual terms. For example, it defines "specified sexual activities" and "simulated display." See §§ 150.103(o), § 150.605(g), 150.605(e).

ii.   Sections 150.606(e) and 150.606(f) are overbroad to the extent that they apply to other performers.

Statutory language is overbroad when "lawmakers define the scope of the statute to reach both unprotected expression as well as, at least potentially, protected speech." American Booksellers v. Webb, 919 F.2d 1493, 1502 (11th Cir. 1990). A statute may not "sweep unnecessarily broadly and thereby invade the area of protected freedoms." NAACP v. Alabama, 337 U.S. 288, 307 (1964). In First Amendment cases, there exists a serious concern that overbroad laws may lead to a chilling effect on protected expression. Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 580 (1998); Dombrowski v. Pfister, 380 U.S. 479, 487 (1965). Still, a statute is invalid under the First Amendment "only if it is 'substantially overbroad, that is, its application would be unconstitutional in a substantial proportion of cases.'" Ward v. Cty. of Orange, 217 F.3d 1350, 1355 (11th Cir. 2000) (quoting Agan v. Vaughn, 119 F.3d 1538, 1542 (11th Cir. 1997)). "[P]articularly where conduct and not merely speech is involved . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." Broadrick, 413 U.S. at 615.

Relatedly, to determine whether a statute is narrowly tailored, courts apply the appropriate level of First Amendment scrutiny. See United States v. O'Brien, 391 U.S. 367, 376–77 (1968); Daytona Grand v. City of Daytona Beach,

490 F.3d 860, 885 (11th Cir. 2007); <u>Giovani II</u>, 470 3d at 1081.[26] Here, that is the <u>O'Brien</u> test, which is akin to intermediate scrutiny. <u>See</u> <u>Clark v. Community for Creative Non-Violence</u>, 468 U.S. 288, 298 (1984) ("[T]he four-factor standard of [<u>O'Brien</u>] . . . is little, if any, different from the standard applied to time, place, or manner restrictions."). [27] A statute survives intermediate scrutiny under <u>O'Brien</u> if it "furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on the alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." <u>O'Brien</u>, 391 U.S. at 377. The narrow tailoring requirement of <u>O'Brien</u> is not the same as a least restrictive means requirement; <u>O'Brien</u> is satisfied "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation," and "the

---

[26] The Court does not discount that the requirement of narrow tailoring and the doctrine of overbreadth are distinct. <u>See</u> <u>Doe I</u>, 909 F.3d at 108–09 ("Labeling wider-than-necessary tailoring as overbreadth is grammatically reasonable but doctrinally conflating. It risks merging <u>O'Brien</u> with the different doctrine of overbreadth."). Narrow tailoring requires that a statute comply with the applicable level of scrutiny (here, <u>O'Brien</u> or intermediate scrutiny), while overbreadth requires that a statute not sweep unnecessarily broadly into constitutionally protected speech and deter people from protected expression. <u>Id.</u> The Court addresses both of those issues here.

[27] In <u>Rameses, Inc. v. County of Orange</u>, 481 F. Supp. 2d 1305, 1315–16, 1319–21 (M.D. Fla. 2007), my colleague, the Honorable John Antoon II, has set forth a cogent analysis of the various levels of scrutiny and the <u>O'Brien</u> test.

means chosen are not substantially broader than necessary to achieve the government's interest." Doe I, 909 F.3d at 111 (quoting Ward, 491 U.S. at 799–800). Plaintiffs take issue only with the final requirement of O'Brien; they argue that §§ 150.606(e) and 150.606(f) are not narrowly tailored. (Doc. 23 at 27–28).

There are two distinct lines of cases on this topic: those that view "simulate sexual activities" and similar phrases to be overbroad or not narrowly tailored, and those that regard such language as constitutionally sufficient. Compare, e.g., Schultz, 228 F.3d 831 and Rameses, 481 F. Supp. 2d 1305, with Giovani II, 470 F.3d 1074. The Code prohibits simulated sexual activity "with any patron, spectator, employee or other person not employed therein" and "while touching or being touched by such patron, spectator or other person." § 150.606(e) (emphasis added). In Rameses, Judge Antoon concluded that a similar statute was overbroad:

> Section 3–129(6) provides that it is unlawful for a worker to "[d]isplay or expose any specified anatomical area while simulating any specified sexual activity with any other person at the adult entertainment establishment, including with another worker." AEC [Adult Entertainment Code] § 3–129(6). Both the Seventh and Ninth Circuit Courts of Appeal have held similar sex act ordinances unconstitutional. See Schultz, 228 F.3d at 847 (Seventh Circuit); R.V.S., L.L.C. v. City of Rockford, 361 F.3d 402, 414 (7th Cir. 2004); Dream Palace, 384 F.3d at 1017–22 (Ninth Circuit); see also Fly Fish, 337 F.3d at 1306–07 (Eleventh Circuit) (acknowledging Schultz 's invalidation of an ordinance banning certain movements and gestures by an adult entertainer). But see Giovani Carandola, 470 F.3d 1074 (4th Cir. 2006). . . . . [A]n ordinance that restricts certain dance movements and gestures above and beyond prohibiting overt sex acts, is

unconstitutional under <u>O'Brien</u> because the restriction exceeds what is essential to further the government's legitimate interest in curbing unwanted secondary effects associated with nude dancing.

The County contends, however, that the [Adult Entertainment Code]'s "simulation" proscription contains two limiting qualifiers, which distinguish it from the ordinances stricken in <u>Schultz</u>, <u>Score</u>[v. City of Shoreline, 319 F. Supp. 2d 1224 (W.D. Wash. 2004)], and <u>Dream Palace</u>. First, the ordinance only forbids simulation of sex acts with another person; it does not forbid solo simulation. [Adult Entertainment Code] § 3–129(6). Second, workers are only prohibited from simulating [specified sexual activity] while simultaneously displaying or exposing a specified anatomical area. <u>Id.</u> However, neither qualification lessens the provision's unconstitutional restriction on protected expressive conduct. . . .

The "other person" requirement is not a remedy for this otherwise unconstitutional statute. It is certainly conceivable that two adult performers might convey a message that is different, but nonetheless protected, from the message portrayed by a solo dancer. The activities that the dancers may permissibly engage in are already constrained by the [Adult Entertainment Code]'s remaining provisions, including the other definitions of actual [specified sexual activity]. The County has offered no justification for why a single dancer may not be prevented from engaging in non-obscene simulated sexual activities during a performance but why two performers may be so prevented. The Court was unable to locate authority holding that touching between two dancers can be constitutionally proscribed, but the district court in <u>Threesome Entertainment v. Strittmather</u> suggested that such a prohibition would be unconstitutional. 4 F. Supp.2d 710, 723 n. 8 (N.D. Ohio 1998) ("It is less clear whether a prohibition of non-overtly sexual touching <u>between two dancers while performing</u>, even if it included a scienter requirement, would also be constitutional; the Court has been unable to locate any case law addressing this specific question, which may implicate the suppression of protected expression.") The "other person" requirement does not save the ordinance.

481 F. Supp. 2d at 1322–23.

Here, the City argues that "[t]he Code does not . . . limit a performer's erotic or sensual expression that is presented without direct physical interaction with another individual," citing to § 150.420, 150.606(f), and 151.410(b)–(f). "Accordingly," the City continues, "performers can still engage in a broad swath of erotic, sensual, and sexually provocative protected expression, including simulated sexual activity and fondling, so long as it is not with another person." (Doc. 25 at 25). But as in <u>Rameses</u>, the City gives no reason why two or more performers expressing an erotic message together carries less First Amendment protection than performers expressing that message on their own. The Code's prohibition reaches and curtails the protected expression that occurs when performers dance together. Thus, the Code sweeps too broadly. The Court adopts the reasoning of Judge Antoon in <u>Rameses</u> and finds §§ 150.606(e) and 150.606(f) overbroad as they apply to other performers. Sections 150.606(e) and 150.606(f) are not overbroad, however, as they pertain to the prohibition of simulated sexual activity with patrons, spectators, and those employed at adult entertainment establishments who are not performers; that prohibition does not reach protected expression in the same manner as a prohibition on performers expressing an erotic message together. If the prohibition against simulated sexual activity, as applied to performers, is removed, the Ordinance is not overbroad.

In addition to overbreadth, the Court must examine the related issue of whether §§ 150.606(e) and 150.606(f) are narrowly tailored. The City argues that its attempt to minimize negative secondary effects of adult entertainment establishments would be less effective without §§ 150.606(e) and 150.606(f). (Doc. 25 at 25). The Code states that negative secondary effects of adult entertainment establishments may include "prostitution, . . . solicitation for prostitution, lewd and lascivious behavior, [and] exposing minors to harmful materials." § 150.101(d). The City claims that "by limiting a performer from engaging in simulated sexual activity with another, the Code more effectively furthers its goal of diminishing the harms of prostitution, solicitation, and lewd and lascivious behavior." (Doc. 25 at 26). Certainly, eliminating simulated sexual activity between performers and patrons inside adult entertainment establishments minimizes the harmful secondary effects of such activity. However, the same is not necessarily true for eliminating simulated sexual activity between performers themselves. While the restrictions in §§150.606(e) and 150.606(f) may prevent problems like prostitution and human trafficking by eliminating simulated sexual activity with others at adult entertainment establishments, they need not forbid performers' erotic or sensual expression with other performers to accomplish that goal. That prohibition is substantially broader than necessary to achieve the government's interest in targeting the negative secondary effects of adult entertainment establishments.

Sections 150.606(e) and 150.606(f) are unconstitutionally overbroad and not narrowly tailored insofar as they apply to performers simulating sexual activity with other performers. Otherwise, they are constitutional. The Court grants in part and denies in part permanent injunctive relief as to Count VIII.

## C.    Count XI – Constitutionality of "Owner," "Operator," and "Manager"

Plaintiffs claim that Chapters 150 and 151 of the Jacksonville Code "make careless use of the undefined terms 'owner,' 'operator,' and 'manager' to identify individuals who are directly or vicariously liable for the operation of gentlemen's clubs and are subject to the criminal and civil penalties specified in the Code." (Doc. 23 at 30); see §§ 150.214(b), 151. 214(b), 150.418, 150.419. Plaintiffs assert that these terms are "loose" and might create a "chilling effect" on speech if employees cannot tell when they may be held liable. Id. The City retorts with Meriam-Webster definitions of each term and says that the Code uses the words in accord with their commonly understood meanings.

The Court agrees with the City. "The terms indicate an intent to hold accountable those who control, direct, or otherwise exercise dominion in running nude or bikini clubs, regardless of how a specific club may title such individuals." (Doc. 25 at 29–30) (citing §§ 150.103(b), 150.208, 150.217, 150.224(k), 150.401, 150.418–419, 150.501, 150.606(d), (g), 151.208(c)–(d), 151.214(k), 151.408–09, 151.502). See also §§ 150.510(a), 151.507(a),

52

150.509(b), 151.506(b). Plaintiffs point neither to case law in which these terms have been deemed unconstitutionally vague, nor to any actual instances of confusion regarding liability. (Doc. 23 at 30–31). There is no expectation of "mathematical certainty from [statutory] language." <u>Pine v. City of West Palm Beach</u>, 762 F.3d 1262, 1275 (11th Cir. 2014) (quoting <u>Grayned</u>, 408 U.S. at 110). The Court denies relief to Plaintiffs as to Count XI.

## IV. SEVERABILITY

The Court must determine whether the invalid portions of the Ordinance are severable from the rest of the Ordinance. "Severability is a judicially created doctrine which recognizes a court's obligation to uphold the constitutionality of legislative enactments where it is possible to remove the unconstitutional portions." <u>Florida Dept. of State v. Mangat</u>, 43 So. 3d 642, 649 (Fla. 2010) (citing <u>Ray v. Mortham</u>, 742 So.2d 1276, 1280 (Fla. 1999)).

Severability is a question of state law. <u>Wollschlaeger v. Governor</u>, 848 F.3d 1293, 1317 (11th Cir. 2017). The "key determination is whether the overall legislative intent is still accomplished without the invalid provisions;" courts adhere to the express intent of the legislature regarding severability whenever possible. <u>State v. Catalano</u>, 104 So. 3d 1069, 1080–81 (Fla. 2012); <u>Lawnwood Med. Ctr., Inc. v. Seeger</u>, 990 So. 2d 503, 518 (Fla. 2008).[28]

---

[28] The Florida Supreme Court in <u>Catalano</u> explained Florida's severability doctrine:

Ordinance 2020-74-E was enacted "to reduce or prevent human and sex trafficking" by "regulating certain businesses and occupations." (Doc. 1-1 at 1). The entirety of §§ 150.224(a)–(n) and 151.214(a)–(n) pertain to "performer work identification cards," i.e., the licensing scheme that the Court has deemed unconstitutional, and must be removed from the Ordinance. But those sections are only one portion of the Ordinance. Other provisions may stand alone and still serve to combat human trafficking. Similarly, §§ 150.212(b) and 151.208(e), which pertain to suspension and revocation of business licenses, are unconstitutional, but they may be severed from the remainder of the Ordinance. Retaining constitutional portions of the Ordinance respects the City's express intention as provided in the Ordinance: "The provisions of this Ordinance are intended to be severable, and if any provision is declared invalid or

---

> [Severability] is derived from the respect of the judiciary for the separation of powers, and is designed to show great deference to the legislative prerogative to enact laws. The portion of a statute that is declared unconstitutional will be severed if: (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other, and (4) an act complete in itself remains after the invalid provisions are stricken.

Catalano, 104 So. 3d at 1080 (quotations and citations omitted).

unenforceable by a court of competent jurisdiction, such provision shall be severed and the remainder shall continue in full force and effect with the Ordinance being deemed amended to the least degree legally permissible." (Doc. 1-1 at 5).

Thus, §§ 150.224(a)–(n), 151.214(a)–(n), 150.212(b), and 151.208(e) should be severed from the remainder of the Ordinance and the larger Jacksonville Municipal Code, of which the Ordinance is a part. The City may also amend §§ 150.606(e) and 150.606(f) to conform to the Court's ruling as to Count VIII.

## V.    PERMANENT INJUNCTION

A permanent injunction requires Plaintiffs to show: (1) actual success on the merits of the claims asserted in the Complaint; (2) that irreparable harm will result without injunctive relief; (3) that the balance of equities tips in their favor; and (4) that an injunction serves the public interest. KH Outdoor, 458 F.3d at 1268. With the exception of showing actual success on the merits instead of likelihood of success, the elements for a permanent injunction mirror those for a preliminary injunction. Id.

Plaintiffs have succeeded on certain of their challenges to the Ordinance. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976); see also Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328,

338 (5th Cir. 1981) ("It is well settled that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction."). Here, portions of the City's Ordinance infringe upon First Amendment expression, and irreparable harm is therefore presumed.

Further, injury to Plaintiffs outweighs any harm brought upon the City by the issuance of the injunction. The City may regulate adult entertainment establishments, but it must do so in a constitutional manner. When an ordinance violates the First Amendment, enjoining the ordinance advances the public's interest in freedom of speech. FF Cosmetics FL, Inc. v. City of Miami Beach, 866 F.3d 1290, 1298 (11th Cir. 2017); see also Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221, 1237 (10th Cir. 2005) ("Vindicating First Amendment freedoms is clearly in the public interest."); Baumann v. City of Cumming, No. 2:07-CV-0095-WCO, 2007 WL 9710767, at *7 (N.D. Ga. Nov. 2, 2007) ("[T]he temporary infringement of First Amendment rights constitutes a serious and substantial injury, and the city has no legitimate interest in enforcing an unconstitutional ordinance."). Ultimately, the public interest is best served when the courts maintain First Amendment freedoms and decline to enforce unconstitutional ordinances. See, e.g., Howard v. City of Jacksonville, 109 F. Supp. 2d 1360, 1365 (M.D. Fla. 2000). Plaintiffs have met the

requirements for a permanent injunction as to the portions of the Code declared unconstitutional or unlawful herein.

## VI.   CONCLUSION

Accordingly, it is hereby

**ORDERED:**

1.     As stated herein, permanent injunctive relief will be **GRANTED** as to **Counts I, III, and XIII**; relief will be **DENIED** as to **Counts XI and XIV**; relief will be **GRANTED in part**, **DENIED in part**, and **DEFERRED in part** as to **Count II**; relief will be **GRANTED in part** and **DENIED in part** as to **Count VIII**; and the Court **DEFERS** ruling on **Counts IV, V, VI, and VII**.

2.     Sections 150.224 and 151.214 (the performer licensing provisions) of Ordinance 2020-74-E of the Jacksonville Municipal Code are found to be facially unconstitutional under the First and Fourteenth Amendments. The City of Jacksonville will be permanently **ENJOINED** from enforcing §§ 150.224 and 151.214 of Ordinance 2020-74-E of the Jacksonville Municipal Code.

3.     Sections 150.212(b) and 151.208(e) of Ordinance 2020-74-E of the Jacksonville Municipal Code are facially invalid under Article V § 2(a) of the Florida Constitution. The City of Jacksonville will be permanently **ENJOINED** from enforcing §§ 150.212(b) and 151.208(e) of Ordinance 2020-74-E of the Jacksonville Municipal Code.

4.      Sections 150.606(e) and 150.606(f) of Ordinance 2020-74-E of the Jacksonville Municipal Code are found to be facially unconstitutional in part under the First and Fourteenth Amendments. The City of Jacksonville will be permanently **ENJOINED** from enforcing §§ 150.606(e) and 150.606(f) of the Jacksonville Municipal Code to the extent stated herein.[29]

5.      A Final Judgment and Permanent Injunction capturing these rulings will be entered at the conclusion of the case.

6.      No later than **April 1, 2021**, Plaintiffs shall file an additional brief of no more than twenty-five (25) pages addressing the Counts deferred herein. No later than **April 30, 2021**, Defendants shall file a response brief of no more than twenty-five (25) pages. No later than **May 14, 2021**, the parties shall jointly submit a case management plan as to the issues to be addressed at the reconvened trial, including a description of the necessary pretrial preparations and a proposed timeline.

---

[29] Some issues raised in Plaintiffs' Motion for Preliminary Injunction (Doc. 2) have been superseded by the Parties' Joint Stipulation and Response to Expedited Scheduling Order (Doc. 21). Those issues are decided here based on trial briefings and the corresponding trial. (Docs. 23, 25, 28, 29, 37). To the extent that issues in the Motion for Preliminary Injunction remain undecided, the parties have agreed that the remaining counts of the Complaint (Doc. 1) will proceed in normal course. Thus, Plaintiffs' Motion for Preliminary Injunction (Doc. 2) is **moot**.

**DONE AND ORDERED** in Jacksonville, Florida the 1st day of March, 2021.



TIMOTHY J. CORRIGAN
United States District Judge

tnm
Copies:

Counsel of record